UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA  )
            )
    v.       )  1:17-cr-00123-JAW-01
            )
MYRON CROSBY, JR.    )

**ORDER ON AMENDED PETITION FOR COMPASSIONATE RELEASE**

A defendant serving one-hundred and sixty-eight months in federal prison for his involvement in a conspiracy to distribute heroin in central Maine moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). The motion raises two questions. First, whether the defendant has met the procedural requirements to file his motion in court. Second, whether the Court should release him to compassionate release and home confinement. Although the defendant has met the procedural filing requirements and has serious medical conditions, the Court concludes the likelihood the defendant will reoffend, along with the short amount of time he has served in comparison with his sentence, and principles of just punishment and deterrence, weigh against his release. The Court denies the motion.

I.  **PROCEDURAL BACKGROUND**

On August 2, 2018, a federal jury in Bangor, Maine convicted Myron Crosby, Jr. of one count of conspiracy to possess and distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846. *Jury Verdict Form* (ECF No. 122). On July 30, 2019, the Court sentenced Mr. Crosby to one hundred and sixty-eight months in prison followed by a five-year term of supervised release, a $100 special assessment, and no fine. *J.* (ECF No. 162) (*J.*). On August 5, 2019, Mr. Crosby

filed a notice of appeal to the Court of Appeals for the First Circuit. *Def.'s Notice of Appeal* (ECF No. 164). His appeal is still pending before the First Circuit.

On April 21, 2020, citing the dangers posed by the ongoing COVID-19 pandemic, Mr. Crosby filed an emergency motion for release. *Emergency Mot. for Temporary Bail, Transfer to Home Confinement, or Compassionate Release.* (ECF No. 177) (*Emergency Mot.*). Two days later, the Government responded and objected. *Gov't's Resp. to Def.'s Mot. for Bail, or Compassionate Release, or for Transfer to Home Confinement* (ECF No. 178) (*Initial Gov't Opp'n*). On April 27, 2020, Mr. Crosby filed some attachments to his initial motion. *Emergency Mot. for Temporary Bail, Transfer to Home Confinement, or Compassionate Release*, Attachs. 1-3 (ECF No. 179) (*Def.'s Attachs.*). In an order dated April 28, 2020, the Court dismissed Mr. Crosby's claim without prejudice due to deficiencies in his motion because his motion failed to show that he exhausted his remedies at the Bureau of Prisons (BOP) under 18 U.S.C. § 3582(c), and because his motion failed to address 18 U.S.C. § 3143(b)(1)(B)'s "substantial question" requirement. *Order on Mot. for Release* at 1 (ECF No. 180).

On May 13, 2020, Mr. Crosby petitioned the warden at FCI Fort Dix for compassionate release or home confinement under the CARES Act. *Gov't's Resp. in Opp'n to Def.'s Am. Mot. for Compassionate Release or Modification of Imposition of Term of Imprisonment*, Attach. 1, *Inmate Req. to Staff, May 13, 2020* (ECF No. 197) (*May 13 Request*). Staff at Fort Dix responded to Mr. Crosby on May 18, 2020, denied his petition, and invited him to submit a more definite statement of reasons justifying his release and a plan for his release from confinement. *Id.*, Attach. 2, *Inmate Req.*

*to Staff Resp.*, *May 18, 2020* (ECF No. 197) (*Prison Resp.*).  The BOP Staff also told Mr. Crosby that he could appeal the decision "through the Administrative Remedy process." *Id.*  There is no evidence that Mr. Crosby did either.

Instead, Mr. Crosby mailed a pro se motion for Compassionate Release pursuant to the 2018 First Step Act, 18 U.S.C. § 3582(c) and (d) to the Court on June 11, 2020.  *Mot. for Modification of Imposed Term of Imprisonment Pursuant to 18 U.S.C. § 3582(c)(1)* (ECF No. 181) (*Def.'s First Mot.*).  The Clerk of Court docketed his motion on June 17, 2020.  *Id.*  On July 7, 2020, the Court appointed Attorney Jeffrey M. Silverstein to represent Mr. Crosby and ordered Mr. Silverstein to file an Amended Petition for Compassionate Release on Mr. Crosby's behalf within seven days, or in the alternative notify the Court that Mr. Crosby intended to proceed on the initial pro se petition.  *Appointment of Counsel & Scheduling Order* at 1 (ECF No. 185).

On July 15, 2020, Mr. Crosby and his counsel filed an unopposed motion to extend the time to file an amended motion.  *Def.'s Mot. to Enlarge the Time Within Which to File Am. Mot. for Compassionate Release* (ECF No. 188).  Also, on July 15, 2020 Mr. Crosby filed his Amended Motion for Compassionate Release.  *Am. Mot. and Mem. in Supp. of Mot. for Compassionate Release or Modification of Imposition of Term of Imprisonment* (ECF No. 189) (*Def.'s Second Mot.*).  He attached several exhibits to the petition, including two BOP medical records.  *Id.*, Attachs. 1-2, *Medical Record dated March 3, 2020*; *Medical Record dated April 7, 2020* (ECF No. 189).  He also attached his request to prison staff for compassionate release dated April 13,

3

2020. *Id.*, Attach. 3, *Inmate Req. to Staff, April 13, 2020* (ECF No. 189). Additionally, he attached the response he received from BOP staff at Fort Dix. *Id.*, Attach. 4, *Inmate Req. to Staff Resp.* (ECF No. 189) (*BOP Resp.*). Finally, he attached a letter from his eldest daughter, describing her plans to support him after his release. *Id.*, Attach 5., *Daughter Letter* (ECF No. 189).

After a series of extensions, the Government filed its opposition to Mr. Crosby's petition on August 12, 2020. *Gov't Resp. in Opp'n to Def.'s Am. Mot. for Compassionate Release or Modification of Imposition of Term of Imprisonment* (ECF No. 197) (*Gov't's Opp'n*). To correct minor details, Mr. Crosby submitted a revised version of his amended motion for compassionate release on August 17, 2020. *Revised Am. Mot. and Mem. in Supp. of Mot. for Compassionate Release or Modification of Imposition of Term of Imprisonment* (ECF No. 200) (*Def.'s Third Mot.*). Mr. Crosby filed his reply to the Government's response on the same day. *Def.'s Reply Mem. in Supp. of Am. Mot. for Compassionate Release or Modification of Term of Imprisonment* (ECF No. 201) (*Def.'s Reply*).

## II.    POSITIONS OF THE PARTIES

### A.    Myron Crosby's Motion

Mr. Crosby argues that his sentence be reduced "to time-served and an imposition of an extended term of Supervised Release." *Def.'s Third Mot.* at 1. He argues that several factors weigh in his favor, namely his "poor health, his age (57 years of age), COVID-19 high risk, Fort Dix infection rates, the fact that [Mr.] Crosby is serving a sentence for a non-violent offense . . .," and that his daughter "is fully

prepared to supervise and care for [Mr.] Crosby for the remainder of his sentence neutralizing any otherwise apparent danger to the community." *Id.*

Mr. Crosby notes that he has "four significant underlying health conditions which place him at an increased risk of severe illness from COVID-19." *Id.* at 2. Specifically, he had a heart attack while in BOP custody, "has a documented history of kidney issues," "is severely obese," and "has Type-2 diabetes." *Id.* He states that, according to the Centers for Disease Control and Prevention (CDC), each of these conditions makes a person more susceptible to serious illness resulting from COVID-19. *Id.* He claims to also have high blood pressure and high cholesterol. *Id.* at 3.

After detailing his physical issues, Mr. Crosby observes that 18 U.S.C. § 3582(c)(1)(A) empowers the Court to reduce his sentence. *Id.* at 4. First, he addresses the § 3582(c)(1)(A)'s exhaustion requirement. *Id.* He argues that he has satisfied the requirement because he submitted his request for compassionate release to the warden at FCI Fort Dix on May 13, 2020. *Id.* The warden's office responded on May 18, 2020 and asked him for more information about which BOP Program Statement 5050.50 criteria applied to his request for release. *Id.* at 5. He states that "[b]y only requesting more information, the Warden expressly failed to either approve or deny the request." *Id.* Thus, he concludes that "[Mr.] Crosby has, as of mid-June 2020, met the 30-day requirement set forth in § 3582(c)(1)(A)." *Id.*

Mr. Crosby then describes "extraordinary and compelling reasons" weigh in favor of his release. *Id.* He observes that courts decide whether such factors are

present with the help of two clarifications from the United States Sentencing Guidelines. *Id.* at 6. The first is that "extraordinary and compelling reasons 'need not have been unforeseen at the time of sentencing.'" *Id.* (citing U.S.S.G. § 1B1.13, Application Note 2). The second is that rehabilitation alone is not an extraordinary and compelling reason, but "may be considered with other factors." *Id.* (citing U.S.S.G. § 1B1.13, Application Note 3).

Mr. Crosby contends that his underlying health conditions put him at risk for severe complications from COVID-19. *Id.* at 6-7. He discusses how the spread of the virus at Fort Dix, including the presence of fifteen infected inmates at Fort Dix, endangers him. *Id.* at 7-8. However, he notes that "COVID-19 does not need to be rampant or prevalent in a facility to be considered a factor in granting compassionate release." *Id.* at 8 (citing cases where courts granted compassionate release for prisoners incarcerated in facilities with no reported COVID-19 cases).

Mr. Crosby next avers that he does "not pose a danger to the community." *Id.* at 10. While acknowledging that his conviction for involvement in a conspiracy to distribute heroin is a "serious offense," he argues that it was "a non-violent matter for which there were no unwitting victims." *Id.* He suggests that the Court impose home confinement and GPS monitoring to mitigate any potential concern about his continuing involvement in criminal activity. *Id.* He also points out that his daughter has offered that he can live with her, that she will support him financially, and that she will ensure that he obtains any necessary medical care. *Id.* Moreover, he informs the Court that his daughter, through her employer, can help Mr. Crosby become

enrolled in "community training programs" that would help his "eventual reintegration into the workforce." *Id.* at 11. Lastly, Mr. Crosby encourages the Court to consider rehabilitation, stating that although Mr. Crosby "is only partially into his lengthy sentence" and he "has presented with no behavior issues while incarcerated." *Id.*

### B.    The Government's Opposition

The Government opposes Mr. Crosby's petition on two grounds. *Gov't's Opp'n* at 1. First, the Government avers that the "Court should deny the motion without prejudice for the Defendant's failure to exhaust administrative remedies." *Id.* Second, the Government argues that even if Mr. Crosby has shown exhaustion, he "has not met his burden of establishing that a sentence reduction is warranted under the statute." *Id.*

Before weighing the merits of Mr. Crosby's request for release, the Government describes Mr. Crosby's offense conduct and the procedural posture of his petition for compassionate release. *Id.* at 1-2. The Government notes that Mr. Crosby is currently housed at FCI Fort Dix with a target release date of August 24, 2029. *Id.* at 2. It also highlights that at the time of filing, FCI Fort Dix had no known active cases of COVID-19 among its inmates. *Id.*

The Government describes the steps that the BOP has taken to reduce the risks posed by COVID-19. *Id.* at 3. According to the Government, these steps are consistent with the Pandemic Influenza Plan the BOP enacted in 2012. *Id.* The Government states that the BOP has adhered to that plan and has adapted it as

necessary to combat the spread of the novel coronavirus.  *Id.*  Under this plan, the Government notes that the BOP has limited inmate contact, prevented inmates from congregating in large groups, restricted transfer of inmates among correctional facilities, screened new inmates for COVID-19, limited non-essential staff travel, and issued face masks to staff and inmates alike.  *Id.* at 3-4.  The Government states that these measures and others "are designed to mitigate sharply the risks of COVID-19." *Id.* at 6.

Next, the Government describes the relevant legal standards concerning compassionate release under the CARES Act and First Step Act.  *Id.* at 6-8.  It then proceeds to its legal arguments.  First, it contends that Mr. Crosby has failed to exhaust his administrative remedies under 18 U.S.C. § 3582(c)(1)(A).  *Id.* at 8.  It cites *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, at *8 (D. Me. Apr. 10, 2020), for the proposition that § 3582(c)(1)(A)'s exhaustion requirement is mandatory.  *Id.* at 9.  The Government contends that the exhaustion requirement is "properly viewed as jurisdictional" but recognizes that the Court has found it to merely be "a non-jurisdictional claim-processing rule."  *Id.* at 10 (citing *United States v. Whalen*, No. 1:11-cr-00033-JAW, 2020 U.S. Dist. LEXIS 118896, at *17-18 (D. Me. July 7, 2020)).

The Government then argues that, because the exhaustion requirement is a statutory claim-processing rule, it "must be enforced if a party 'properly raise[s]' it." *Id.* at 11 (citing *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam)).  It claims that courts have no discretion to carve out exceptions to statutory claim

processing rules.  *Id.*  The Government posits that Mr. Crosby has failed to exhaust the administrative remedies available to him at Fort Dix.  *Id.* at 12.  In doing so, it highlights that, in their May 18, 2020 response to his request for compassionate release, the staff at Fort Dix requested that he provide additional information.  *Id.*  The Government states that "it does not appear [Mr. Crosby] has provided this additional information and the warden has not considered [Mr. Crosby's] request upon the merits."  *Id.*  Thus, the Government concludes Mr. Crosby "has provided insufficient evidence upon which the Court could properly determine that he exhausted his administrative remedies."  *Id.*

The Government then shifts to the merits of Mr. Crosby's petition.  First, it concedes that while COVID-19 is not itself an extraordinary and compelling reason for release under § 3582(c)(1)(A), the risk the virus poses to individuals with pre-existing conditions is.  *Id.*  at 12-13.  Then, the Government argues that Ms. Crosby "has failed to demonstrate that he is not a danger to the safety of the community" or that the § 3553(a) factors weigh in favor of his release.  *Id.* at 14.  The Government contends that Mr. Crosby "is a lifelong criminal who has been committing serious crimes, including assault and drug trafficking, since the 1970's."  *Id.* at 15.  Finally, the Government points out that Mr. Crosby has only served approximately twenty percent of his sentence.  *Id.*  Thus, the Government concludes that "factors mitigating against a sentence reduction outweigh the [Mr. Crosby's] asserted medical concerns related to COVID-19."  *Id.*

### C.     Myron Crosby's Reply

Mr. Crosby's reply asserts that his claim is properly before the Court.  *Def.'s Reply* at 1.  He argues that the "Government reads and applies the requirements of 18 U.S.C. § 3582(c)(1)(A) too narrowly."  *Id.*  Mr. Crosby characterizes the May 18, 2020 response he received as a failure "to either approve or deny" his request for compassionate release.  *Id.* at 2.  Therefore, he contends that when he filed his petition with the Court on June 10, 2020, he had satisfied the thirty-day requirement under § 3582(c)(1)(A).  He cites *United States v. Browne*, Criminal No. 14-10369-LTS, 2020 U.S. Dist. LEXIS 116518 (D. Mass. July 2, 2020) for the proposition that § 3582(c)(1)(A) provides two ways that a defendant can show exhaustion.  *Id.* at 2-3.  Either a defendant can fully exhaust all administrative rights within the BOP to appeal the denial of request for compassionate release, or he can wait until thirty days have passed after he submitted the petition.  *Id.*  He states that under § 3582(c)(1)(A), "whichever is earlier" controls for exhaustion purposes.  *Id.* at 3.  He further argues that in *Browne*, the Court found a prisoner met the thirty-day requirement even though his petition had been denied and he had failed to pursue an administrative appeal within the BOP.  *Id.*  He claims that under *Browne*, the fact that thirty days had lapsed sufficed for exhaustion under § 3582(c)(1)(A).  *Id.*

As applied to his own case, Mr. Crosby reaffirms that he has shown exhaustion.  *Id.* at 3-4.  He notes that he petitioned the warden at Fort Dix for release on May 13, 2020 and received a response on May 18, 2020.  *Id.*  He dated his motion for release on June 10, 2020 and the Court docketed the motion on June 17, 2020.  *Id.*  He notes

that in any event, the "June 17 receipt and file date exceeded [Mr.] Crosby's application to the Warden by 30 days" and that "more than 30 days elapsed between the Warden's receipt of Crosby's request until now." *Id.* at 4.

Mr. Crosby argues that the May 18, 2020 response from the warden's office was neither an approval or denial, but a request for more information. *Id.* Mr. Crosby suggests that providing more information would have been futile. *Id.* This is because "the document sent by the Warden contains incomplete information for the lawful bases for Compassionate Release." *Id.* He explains that rather than relying on the provisions cited in the warden's response, U.S.S.G. § 1B1.13, Application Notes 1(A)-(C), his provision relies on the so-called catch-all provision of the U.S. Sentencing Commission's criteria for compassionate release. *Id.* at 5 (citing U.S.S.G. § 1B1.13, Application Note 1D). Thus, he avers that the May 18, 2020 response "contained outdated and limited criteria of eligibility for Compassionate Release" and "routed [Mr.] Crosby down a road to nowhere." *Id.* at 6. He claims that "he was forced into a circular position in which no adequate relief could be granted, despite Crosby's increased risk of severe illness from COVID-19." *Id.*

Mr. Crosby asserts that while typically "exhaustion requirements are strictly enforced," there are three recognized exceptions to § 3582(c)(1)(A)'s exhaustion requirement. *Id.* at 7. Citing *United State v. Perez*, 451 F. Supp. 3d 288 (S.D.N.Y. 2020), he states that exhaustion is excused if futile, unnecessary because the administrative body cannot grant the requested remedy, or when pursuing an administrative review would cause undue prejudice to the claimant. *Id.* He claims

11

that all three exceptions apply here.   Mr. Crosby suggests providing further information would have been futile because "he was forced to identify a basis upon which he concedes he would not qualify." *Id.* He states that there was "no basis to believe or expect the administrative process would be capable of granting adequate relief" because the catch-all provision was not referenced in the warden's response. *Id.* at 7-8.  He also notes that waiting to exhaust administrative appeals would cause him prejudice, by forcing him to remain in prison and risk exposure to COVID-19.  *Id.* Finally, he notes that any failure in the exhaustion process is not jurisdictional.  *Id.*

In the remainder of his reply, Mr. Crosby rehashes the merits of his motion for compassionate release.  *Id.* at 9.  He avers that he is not a danger to the community because his involvement in the heroin conspiracy was non-violent and only arose due to his own drug addiction.  *Id.*  He points out that he has been drug-free since his incarceration began and has not been disciplined since entering BOP custody.  *Id.* at 9-10.  He also draws the Court's attention to his "continued substantial efforts towards rehabilitation." *Id.* at 10. Mr. Crosby has completed drug treatment, several educational programs, and has a yard detail position at Fort Dix.  *Id.*  He therefore concludes that "[h]e is a very different man than that arrested in September, 2017." *Id.* at 11.  Thus, he argues that an adjustment of his sentence and a release to home confinement are proper.  *Id.*

## III.   LEGAL STANDARD

In relevant part, 18 U.S.C. § 3582(c)(1)(A)(i) states:

The Court may not modify a term of imprisonment once it has been imposed except that . . . in any case . . . the court, upon motion of the

Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that . . . (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . ..

Before a court considers a defendant's motion for compassionate release, it must determine whether the defendant has met the procedural prerequisites for bringing such a motion. *See United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (finding the exhaustion or thirty-day requirement of section 3582(c) mandatory). These requirements are mandatory. *See id.* ("There is no exception to this requirement in the language of section 3582(c), and the Court cannot read one into the section"). However, the exhaustion requirement is not a jurisdictional bar and can be waived. *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020); *United States v. Faucette*, No. 2:13-cr-79-DBH-01, 2020 U.S. Dist. LEXIS 143154, at *2 (D. Me. Aug. 11, 2020); *United States v. Whalen*, No. 1:11-cr-00033-JAW, 2020 U.S. Dist. LEXIS 118896, at *13 n.2, 15 (D. Me. July 7, 2020) ("District courts within this circuit have so far concluded that the exhaustion requirement in § 3582(c)(1)(A) is nonjurisdictional").

Federal district courts are split about how an inmate satisfies the exhaustion requirement. *See Whalen.* 2020 U.S. Dist. LEXIS 118896, at *13 n.2 (mapping the district court split). The First Circuit has not yet ruled on this issue. Courts agree that a prisoner must first request the BOP to bring a motion for compassionate

release on their behalf.  However, federal district courts disagree about what happens if the BOP denies that petition.  *Id.*  Some find the lapse of thirty days from requesting the BOP move for the prisoner's release satisfies § 3582(c).  *See, e.g., United States v. Vence-Small*, No. 3:18-cr-00031 (JAM), 2020 U.S. Dist. LEXIS 69354 (D. Conn. Apr. 20, 2020).  Others conclude that exhaustion is only met when the petitioner fully exhausts all administrative remedies available to him within the BOP, including his right to appeal a denial, provided that the BOP denies the inmate's initial petition within thirty days.  *See, e.g., United States v. Rembert*, Criminal No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 107423, at *2-3 (D. Me. June 19, 2020) (joining "those courts that have concluded that the 30-day language is designed to ensure that the Warden acts timely and that when she does, the prisoner needs to exhaust his administrative appeal rights before proceeding to court"); *United States v. Saenz*, Case No. 97CR2106-JLS, 2020 U.S. Dist. LEXIS 93337, at *4 (S.D. Cal. May 28, 2020) (finding no exhaustion where defendant failed to appeal a denial of his petition for compassionate release even though thirty days had passed since the BOP denied his petition); *United States v. Miller*, Case No. 2:16-cr-00269-BLW, 2020 U.S. Dist. LEXIS 4797, at *5 (D. Idaho Jan. 8, 2020) (citing Black's Law Dictionary for the proposition that lapse "means that the warden must fail to act on the defendant's request for a period of 30 days").  These courts have found that the thirty-day language is intended to "ensure that the Warden acts timely."  *Rembert*, 2020 U.S. Dist. LEXIS 107423, at *2.

Even so, there is convincing caselaw that the Government may waive the exhaustion requirement. *United States v. McIntosh*, No. 2:16-cr-100-DBH, 2020 U.S. Dist. LEXIS 149032 (D. Me. Aug. 18, 2020) is illustrative. On July 31, 2020, Judge Hornby of this district denied a petition for compassionate release without prejudice because the inmate had failed to pursue an administrative appeal. *United States v. McIntosh*, No. 2:16-cr-100-DBH, 2020 U.S. Dist. LEXIS 136379, at *2 (D. Me. Jul. 31, 2020). However, shortly thereafter, the Department of Justice informed Judge Hornby that it is taking "the position that a prisoner is not required to exhaust administrative appeal remedies within the [BOP] before filing a motion in court under the First Step Act, and may file the motion 30 days after submitting a request for compassionate release to the Warden, regardless of whether the Warden denied the request." *Id.*, 2020 U.S. Dist. LEXIS 149032, at *1. As Judge Hornby earlier concluded that the Government could waive the exhaustion requirement, *Faucette*, 2020 U.S. Dist. LEXIS 143154, at *2, he vacated his earlier ruling and reached the merits of the inmate's compassionate release petition. *McIntosh*, 2020 U.S. Dist. LEXIS 136379, at *1-2.

When a defendant shows exhaustion, a court may reach the merits of the petition for compassionate release and determine whether "extraordinary and compelling reasons warrant" the movant's release, considering in its determination "the factors set forth in section 3553(a)" and "applicable policy statements issued by the Sentencing Commission . . .." 18 U.S.C. § 3582(c)(1)(A). The United States Sentencing Commission issued a policy statement under United States Sentencing

Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[1] The Guidelines note that the movant must meet the "requirements of subdivision (2) . . .." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). Subdivision (2) provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). . .."

Section 3142(g) sets forth the factors a court must consider before releasing a person pending trial and these standards are incorporated into the assessment of a request for compassionate release. They include (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). Regarding the history and characteristics of the person, the statute provides that the court must consider:

(A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial,

---

[1]    The Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act; its provisions are therefore not directly related to the unique circumstances presented by a global pandemic. Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion.

> sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . . .

18 U.S.C. § 3142(g)(3)(A-B).

After a court has determined whether the defendant is dangerous, § 1B1.13 provides that the court should determine whether "extraordinary and compelling reasons" exist to release the defendant.  U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.1 (U.S. Sentencing Comm'n 2018).  The policy statement provides that "extraordinary and compelling reasons" may exist under any of the following circumstances:

(A)   **Medical Condition of the Defendant.—**

(i)   The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)   The defendant is—

(I)   suffering from a serious physical or medical condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)   **Age of the Defendant.—**The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or

17

mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     **Family Circumstances.—**

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     **Other Reasons.—**As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* § 1B1.13 cmt. n.1(A-D).  The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* § 1B1.13 cmt. n.2.  Finally, the policy statement states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* § 1B1.13 cmt. n.3.  The movant has the burden of showing entitlement to a sentence reduction, and "the Court 'has broad discretion in deciding whether to grant or deny a motion for sentence reduction.'" *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, No. 18-cr-108-LM, 2020 U.S. Dist. LEXIS 83396, at *4 (D.N.H. May 12, 2020) (internal citation omitted)).

## IV.    FACTUAL BACKGROUND

### A.    The Presentence Investigation Report

When the Court sentenced Mr. Crosby, it relied upon a Revised Presentence Investigation Report (PSR) that was prepared by the United States Probation Office (PO).  At his sentencing, Mr. Crosby admitted that the factual portions of the report were accurate and provided the additional fact that he was diagnosed with Stage Four kidney failure in July 2019.  *See Tr. of Proceedings* at 8:06-10:25 (ECF No. 168) (*Sentencing Tr.*).

### 1.    Myron Crosby's History and Characteristics

Born in New Britain, Connecticut, Myron Crosby is fifty-seven years old.  *PSR* ¶ 77.  His parents, Marion Crosby and Ruth-Anne Wise are both deceased.  *Id.*  He has three biological siblings with whom he was reportedly in regular contact at the time of his sentencing.  *Id.*  Although Mr. Crosby has never married, he was engaged at the time of his sentencing.  *Id.*  He has four children who live in Massachusetts and Connecticut.  *Id.*  According to one of his daughters, he is close with his children and has regularly been in contact with them.  *Id.*  He relied on his children and fiancé for support.  *Id.*

Mr. Crosby has spent his life moving between Connecticut and Massachusetts. *PSR* ¶ 78.  Most recently before his arrest, he lived in Springfield, Massachusetts. *Id.*  As a youth Crosby was raised by his mother but had little contact with his father. *Id.*  He dropped out of school in seventh grade but obtained his general equivalency degree (GED) when he was forty-nine.  *Id.*  Mr. Crosby indicates that he was not

19

physically abused during his life but that he was raised in neighborhoods where he frequently witnessed crime and violence. *Id.* His daughter reported that he was homeless for a time. *Id.* Mr. Crosby's mother died around 1986 or 1987 and he started using heroin and cocaine around that time. *Id.* In 2002, his brother Michael died from HIV. *Id.* According to Mr. Crosby's daughter, Michael's death "hit him hard." *Id.* Mr. Crosby stated that when he was arrested for the heroin conspiracy, he had not been in trouble with the law for almost five and one-half years. *Id.*

Mr. Crosby has a history of substance abuse. There is conflicting evidence about the extent of his alcohol abuse, but his PSR stated Mr. Crosby told the PO that he had been drinking one-half pint of alcohol daily in the six months before his arrest. *Sentencing Tr.* at 54:19-24; *PSR* ¶ 82. Mr. Crosby has also abused drugs. *PSR* ¶ 82. As a teenager he experimented with LSD for approximately a year. *Id.* Between the ages of fifteen and nineteen, he regularly used marijuana. *Id.* When he turned nineteen, he started using harder drugs such as crack and powder cocaine. *Id.* He informed the PO that he had continued to use cocaine, particularly crack cocaine, since his first use. *Id.* Mr. Crosby began to use heroin in the late 1980s as a way of coping with the loss of his mother. *Id.* He was a daily user of heroin for years and reported that he last used heroin on the day before his arrest. *Id.* Mr. Crosby told the Probation Office that he "always uses drugs while driving." *Id.*

Mr. Crosby has a number of serious health conditions. At sentencing, the Court noted there was "some evidence that he had a heart attack while in custody," and he has high blood pressure, high cholesterol, Stage Four kidney disease, and

diabetes. *Sentencing Tr.* at 55:5-8. The PSR confirms this. *PSR* ¶ 80. Mr. Crosby has submitted two medical records to supplement his medical history. The first, dated March 3, 2020 reveals that Mr. Crosby has a body mass index (BMI) of 40.2, diabetes, and hyperlipidemia. *Medical Record dated March 3, 2020* at 1.

The second record dated April 7, 2020, details his visit with a nurse about complaints of chest pain. *Medical Record dated April 7, 2020.* The nurse detailed Mr. Crosby's cardiac history. The record states that Mr. Crosby told the provider that he had been hospitalized for five days in 2017 for a heart attack, but the BOP nurse says that the BOP does not have a record of that admission. *Id.* He underwent an echocardiogram on October 25, 2019 and he was seen by a cardiologist on November 19, 2019. *Id.* The cardiologist recommended that he undergo a stress echocardiogram; however, an administrative note at the top of the record says that he refused the recommended test. *Id.* Under the section of the record labelled "IMPRESSION," the nurse notes that Crosby's pain is "somewhat atypical, but he does have multiple risk factors for coronary disease." *Id.* The record also notes that he has "chronic renal insufficiency," that his LDL is below target, and that his diabetes is under "reasonable control." *Id.*

### 2. Myron Crosby's Criminal History

As the Court observed at Mr. Crosby's sentencing hearing, his criminal history is "extremely extensive." *Sentencing Tr.* at 55:13-14. The Government counted sixty-eight different criminal offenses that Mr. Crosby had been convicted of committing. *Id.* at 55:13-15. His PSR reveals the details. Mr. Crosby has been convicted of assault

seven times. *PSR* ¶¶ 24, 25, 26, 27, 51. He has nine drug-related convictions. *PSR* ¶¶ 30, 39, 41, 56, 58, 59. Six times he has been convicted of resisting arrest. *PSR* ¶¶ 29, 33, 37, 51, 53, 58. He also has twenty-four motor vehicle offense related convictions. *PSR* ¶¶ 34-35, 41-47, 49-50, 53-58.

### 3.    Nature and Circumstances of the Offense

#### a.    Count One: Conspiracy to Distribute and to Possess with Intent to Distribute One Kilogram or More of Heroin

Mr. Crosby was convicted due to his involvement with a heroin distribution conspiracy that took place approximately between May 2015 and January 2016. *PSR* ¶ 4. Reading about the arrest of drug dealers in the Newport, Maine area, two local truckers viewed the news not as a cautionary tale but as an opportunity to make money, and they decided to haul a new product - heroin. *Id.* To carry out this scheme, Todd Shorey and Jamie Akerson needed to find a heroin supplier. *Id.* Mr. Akerson was introduced in Springfield, Massachusetts to a supplier named "Templer" later revealed to be Myron Crosby. *Id.* At their first meeting, Mr. Akerson obtained about four-hundred to five-hundred dollars' worth of heroin from Mr. Crosby. *Id.*

In the ensuing months, Mr. Crosby had numerous meetings with his conspirators from Maine. *Id.* ¶ 5. Maine conspirators would make heroin runs to Hartford, Connecticut and Springfield, Massachusetts to meet Mr. Crosby and obtain heroin in exchange for money. *Id.* At first, Mr. Crosby sold the conspirators between five-hundred and one-thousand dollars' worth of heroin per week. *Id.* Over time, this

increased to between ten- to fifteen-thousand dollars' worth per week. *Id.* Each week, the Mainers would travel south, meet Mr. Crosby at locations such as fast food restaurants or truck stops and give him cash. *Id.* Mr. Crosby would leave with the cash and return with the heroin. *Id.* The Mainers returned to Maine with the heroin where Mr. Akerman and his co-conspirators distributed it. *Id.* Although he received cash from the Maine conspirators, Mr. Crosby has stated through objections that he received no income for his work and instead only earned bundles of heroin for his own use. *Id.* The testimony of a source of information (SI) established that Mr. Crosby's offense involved between three and ten kilograms of heroin. *Id.* ¶ 6.

The SI also testified that he bought Mr. Crosby a Ruger .380 firearm on one supply trip. *Id.* ¶ 7. Another SI confirmed this, stating that Mr. Crosby had initially asked him for a firearm, but that request was passed on to a different SI. *Id.*

### b.   Guideline Calculations

At sentencing, the Court concluded that Mr. Crosby had a criminal history category of II and a total offense level of thirty-four. *Sentencing Tr.* at 29:22-30:3. His guideline range was one-hundred and sixty-eight to two-hundred and ten months. *Id.* He was not eligible for probation; the guideline term of supervised release was five years. *Id.* There was a special assessment of one-hundred dollars. *Id.* The Court sentenced Mr. Crosby to one-hundred and sixty-eight months in prison. *J.* at 2 (ECF No. 162). The Court also imposed a five-year period of supervised release and a one-hundred-dollar special assessment. *Id.* at 3, 6. The Court did not impose a fine. *Id.* at 6.

## V.   DISCUSSION

The Court first addresses Mr. Crosby's motion using the criteria of the applicable statutes and Guidelines and then reviews whether he has otherwise made the case for compassionate release.  There are two issues:  first, whether Mr. Crosby's motion is procedurally proper, and second, whether he has proven that his compassionate release request for home confinement has merit.

### A.   Exhaustion

In this case, the parties disagree on whether Mr. Crosby has satisfied the exhaustion requirement.  *See Gov't's Opp'n* at 12 ("[Mr. Crosby] has provided insufficient evidence upon which the Court could properly determine that he exhausted his administrative remedies"); *contra Def.'s Reply* at 8 ("This Court should conclude that Mr. Crosby has complied with § 3582(c)(1)(A) [w]hether by virtue of the expiration of the 30-day period following receipt by the Warden of [Mr.] Crosby's May 13, 2020 request for Compassionate Release or the futility of the need to further pursue administrative remedies . . .").

At the outset, the Court readily concludes that Mr. Crosby has not fully exhausted his rights within the BOP to appeal the warden's denial.  There is no evidence in the record to support a finding of complete administrative exhaustion.  In fact, Mr. Crosby admits that he did not exhaust.  *Def.'s Reply* at 6 ("The Defendant admits he did not pursue [the administrative appeals] process").  It does not matter.  The Government concedes that "[a]lthough the Government uses the term, 'exhaustion requirement,' an inmate need not 'exhaust' administrative remedies if

the motion is filed 30 days after receipt of the request by the warden." *Gov't's Opp'n* at 7 n.1. The Government may waive the exhaustion requirement. *Faucette*, 2020 U.S. Dist. LEXIS 143154, at *2. Here, the Government waived the exhaustion requirement. *Id.*; *Whalen*, 2020 U.S. Dist. LEXIS 118896, at *7.

## B. The Thirty-Day Exhaustion Requirement

This conclusion does not end the exhaustion matter. To determine whether Mr. Crosby exhausted under § 3582(c)(1)(A)(i), the Court next considers whether a thirty-day lapse occurred in this case. This is a question of timing and hinges on the date the warden received Mr. Crosby's request for release and the date Mr. Crosby filed his motion with the Court.

Again, the statute reads:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment

18 U.S.C. § 3582(c)(1)(A)(i). The statutory language controls. The start of the thirty-day exhaustion clock begins when the warden receives the inmate's request. *Id.* ("30 days from the receipt of such a request by the warden"). As the district court pointed out in *United States v. Resnick*, 451 F. Supp. 3d 262 (S.D.N.Y. 2020), a case where there was a two-and-one-half week delay between the date the inmate filed his request and the date the warden stamped it "received," the statute does not say, "30 days, plus an additional 2.5 weeks until the form is formally accepted by the warden's office." *Id.* at 269. In *Resnick*, the district court fixed the date for the thirty-day

25

period as the date the inmate personally handed the form to his counselor. *Id.* at 268-69.

The Court's docket reflects that Mr. Crosby sent an email to his "case manager coordinator" on April 13, 2020.[2] *Initial Gov't Opp'n* Attach. 1, *Email from Myron Crosby, Jr. to Case Manager Coordinator* (Apr. 13, 2020). In the April 13, 2020 email, Mr. Crosby expressly requested "consideration of home confinement under the CARES Act of 2020." *Id.* He says that he "meets the criteria thus far identified in the Act and AG Barr[']s DOJ Memorandum." *Id.* He explains that due to his age and medical conditions, he is "particularly susceptible to the dangers of COVID-19 Virus and this makes me a prime candidate for release at this time." *Id.* Mr. Crosby goes on to describe his medical conditions in further detail and writes that he has a reentry plan for a "secure and safe place to live with my daughter and grandson's in Manchester, CT." *Id.* He also represents that he has an employment opportunity "with the goal of recidivism reduction." *Id.*

The Court finds that Mr. Crosby's April 13, 2020 email to his case manager counselor started the thirty-day clock under 18 U.S.C. § 3582(c)(1)(A)(i). It is true that Mr. Crosby miscited the CARES Act when he should have cited the First Step Act, but the law does not hold inmates to the standards of lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam) (noting that courts should read pro se pleadings less strictly than pleadings drafted by lawyers); *Dutil v. Murphy*, 550 F.3d 154, 155

---

[2]    The parties do not argue the April 13, 2020 date as the triggering date. Instead, they focus on May 13, 2020. *Gov't's Opp'n* at 10; *Def.'s Reply* at 1. However, the April 13, 2020 email is a part of the record the parties provided and the Court, therefore, considered it.

(1st Cir. 2008) ("[A]s a general rule, we are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, we hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects").   Furthermore, Mr. Crosby's reference to Attorney General Barr's directive to the BOP confirms that Mr. Crosby intended to proceed under the First Step Act.   *See Att'y Gen. Barr Memo. for Director of BOP*, *Prioritization of Home Confinement as Appropriate in Resp. to COVID-19 Pandemic* (Mar. 26, 2020); *Resnick*, 451 F. Supp. 3d at 267-68.

Even though the statute requires the inmate to deliver the request to the warden, the *Resnick* Court properly concluded that delivery to the inmate counselor sufficed because this "is typically the only mechanism by which an inmate can communicate with the warden's office." *Resnick*, 451 F. Supp. 3d at 268; *United States v. Ozols*, 16-CR-692-7 (JMF), 2020 U.S. Dist. LEXIS 96688, at *3 n.1 (S.D.N.Y. June 2, 2020) ("[T]he date on which the prisoner handed the request to prison officials controls"); *United States v. Sommerville*, 2:12-CR-225-NR, 2020 U.S. Dist. LEXIS 93935, at *7 n.2 (W.D. Pa. May 29, 2020).   "Inmates are not typically handed the keys of the warden's office so they can place their applications for compassionate release on the warden's desk." *Resnick*, 451 F. Supp. 3d at 268.

A fair reading of the April 13, 2020 email that Mr. Crosby is asking the BOP to release him home because he is at high risk of complications if he contracted COVID-19.   In the Court's view, Mr. Crosby's request should have triggered a BOP

response and was enough to start the thirty-day clock under § 3582(c)(1)(A)(i) on April 13, 2020.[3]  As Mr. Crosby filed his motion with the Court in June 2020, the motion was filed well after the thirty-day period had lapsed.[4]

## C.    Danger to the Community

Any reduction in sentence must be "consistent with applicable policy statements issued by the Sentencing Commission."    18 U.S.C. § 3582(c)(1)(A). Relevant here, the United States Sentencing Commission issued a policy statement that states the movant must meet the "requirements of subdivision (2)," which provides that the Court must determine "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . . ." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). Thus, notwithstanding any extraordinary and compelling reasons for Mr. Crosby's release, the Court must determine that he is not a danger to the community. Otherwise, release is improper.

The Government contends that Mr. Crosby poses too great a danger to the community to be released.  *Gov't's Opp'n* at 15.  It claims Mr. Crosby "is a lifelong criminal who has been committing serious crimes, including assault and drug

---

[3]      The Court's Order on Motion for Release is consistent with this finding.  *See Order on Mot. for Release* (ECF No. 180).  The Court dismissed Mr. Crosby's petition on April 28, 2020, not because he had not fulfilled the notice requirement to the Warden in his April 13, 2020 email but because he had not then waited the full thirty days from April 13, 2020 to file his compassionate release motion with the Court.  *Id.* at 5 ("[A]ssuming his April 13, 2020, email to his case manager coordinator started the thirty-day exhaustion period, the time the statute grants the BOP to respond has not yet lapsed") (internal citation omitted).

[4]      This is true whether the filing date is the date Mr. Crosby put the motion in the prison mail system, June 11, 2020, or the date the Court received the motion, June 17, 2020.  *Compare Def.'s First Mot.* Attach. 4, *Envelope*; *with Def.'s First Mot.* at 1.

trafficking, since the 1970's." *Id.* (citing *PSR* ¶¶ 23-58).  It also highlights that "[h]is most recent federal conviction endangered small communities by transporting multiple kilograms of heroin from out of state into the state of Maine . . ." and that he "has serious substance abuse issues involving both alcohol and drugs."  *Id.*  In response, Mr. Crosby avers that he has substantially rehabilitated himself since entering BOP custody and lists the numerous educational and mental health courses he has completed within the BOP.  *Def.'s Reply* at 10.  His counsel further states that "[h]e is a very different man than that arrested in September 2017."  *Id.* at 11.

The Court is very encouraged to learn that Mr. Crosby is availing himself of the BOP's educational resources.  He should continue these efforts, they will greatly help him when he is released from BOP custody.  However, Mr. Crosby has not met his burden to show that he is no longer a danger to the community.  The Court agrees with the Government's assessment that Mr. Crosby's criminal history is substantial.  He has been convicted of criminal conduct countless times since reaching adulthood.  Some of those crimes have been violent and involved threatening others with firearms.  He has also been implicated in several controlled substance offenses.

The Court has also factored into its dangerousness analysis the seriousness of Mr. Crosby's offense-of conviction.  For several months between approximately May 2015 and January 2016 there was a conspiracy to distribute heroin in central Maine that was brought in from outside of the state.  *PSR* ¶ 4.  Mr. Crosby was an out-of-state distributor who provided heroin to the Mainers involved with the conspiracy.  *Id.* ¶ 5.  At first, the Mainers purchased five hundred to one thousand dollars-worth

29

of heroin from Mr. Crosby each week. *Id.* Though, as time went on, that amount increased to between ten thousand and fifteen thousand dollars-worth of heroin per week. *Id.* It is clear that Mr. Crosby distributed at least three kilograms of heroin, but he could have been responsible for more than eight kilograms. *Id.* ¶ 6. Mr. Crosby's co-conspirators gave him a Ruger .380 firearm after he requested a gun. *Id.* ¶ 7.

As someone who has battled a heroin addiction for decades, Mr. Crosby knows its destructiveness better than most. Still, he chose to be the supplier of enormous quantities of heroin to drug dealers in Maine. As the Court explained to Mr. Crosby at his sentencing, while he is incarcerated "the people who live in the towns of Newport and Palmyra are still trying to pick up from the wreckage [he] left behind. They have sons and daughters that they love and they're still trying to struggle through their addiction." *Sentencing Tr.* at 61:15-19. Given the seriousness of his offense, the Court finds that he remains a danger to the community. Standing alone, this conclusion precludes his release.

### D.    The 3553(a) Factors

The Court considered the 18 U.S.C. § 3553(a) factors at Mr. Crosby's sentencing. *Sentencing Tr.* at 52:25 - 53:9. It paid particular attention to his history and characteristics, the nature and circumstances of the offense, and the need to avoid unwarranted sentencing disparities. *Id.* at 53:4-7. After reviewing the whole record, the Court reaffirms its prior determination of these factors. In addition, the

Court has considered the need for just punishment and specific and general deterrence. These factors do not weigh in favor of releasing Mr. Crosby.

### E.   Extraordinary and Compelling Reasons

To grant Mr. Crosby's petition under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence. The Court reviews Mr. Crosby's medical conditions and his risk of contracting COVID-19 and finds that although he has serious health conditions, he has not shown that extraordinary and compelling reasons merit his release.

### 1.   Myron Crosby's Medical Conditions

The Court acknowledges that Mr. Crosby has several serious and chronic health conditions. The Court noted at his sentencing that there was "some evidence that he had a heart attack while in custody," and that he has high blood pressure, high cholesterol, Stage 4 kidney disease, and diabetes. *Sentencing Tr.* at 55:5-8. The PSR supports these findings. *PSR* ¶ 80. Mr. Crosby has provided two recent supplemental medical records. The first, dated March 3, 2020, shows that Mr. Crosby has a body mass index (BMI) of 40.2, diabetes, and hyperlipidemia. *Medical Record dated March 3, 2020* at 1. The second record dated April 7, 2020 recounts Mr. Crosby's appointment with his cardiologist on November 11, 2019. *Medical Record dated April 7, 2020.*

According to the CDC several factors increase a person's risk of severe illness from COVID-19. One key factor is a person's age. *Older Adults*, CDC, cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited

Oct. 26, 2020).  Generally, the risk of COVID-19 increases as a person ages, with over eighty-percent of deaths occurring in people who are sixty-five or older.  *Id.*  However, people younger than sixty-five may still face high risk of complications.  *Id.*  People with certain medical conditions are at high risk, too.  *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Oct. 26, 2020).  These conditions include: cancer, chronic kidney disease, COPD, heart conditions, weakened immune systems, obesity (BMI > 30), severe obesity (BMI > 40), sickle cell disease, smoking, and Type 2 diabetes.

Unfortunately, Mr. Crosby checks nearly every box.  Although he is in his fifties, his BMI is over forty, indicating that he is severely obese, and he has stage four kidney disease, Type 2 diabetes, and a history of heart problems.  Based on this record, the Court concludes that Mr. Crosby is at a heightened risk of serious complications should be contract COVID-19.  The Court is very concerned about this finding and weighs it in favor of his release.

### 2.   Fort Dix FCI and COVID-19

The Court turns to how likely it is that Mr. Crosby will contract COVID-19 while incarcerated.  The relevant data for evaluating Mr. Crosby's risk of contracting COVID-19 are the statistics from Fort Dix FCI where he is incarcerated.  According to the BOP, FCI Fort Dix houses 2,716 inmates, of which 2,549 are housed at the FCI

and 167 are at a nearby camp operated by the BOP. *FCI Fort Dix*, BOP, https://www.bop.gov/locations/institutions/ftd/ (last visited Oct. 26, 2020). Presently, there are seventeen active cases of COVID-19 among inmates at FCI Fort Dix. *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Oct. 26, 2020). None has died. *Id.* On these figures, the Court has determined that only 0.66 percent of inmates at FCI Fort Dix are currently known to have COVID-19. (17 ÷ 2,549 = 0.0066). However, a higher percentage has tested positive over the course of this year. (161 ÷ 2,549 = 0.0631). Although Fort Dix's recent numbers are encouraging, the Court acknowledges that a federal prison presents a certain irreducible risk of COVID-19 transmission among inmates, corrections officers and others, and unlike a person on home confinement, an inmate has a limited ability to protect himself from transmission.

### 3.    Fort Dix versus Home Confinement in Connecticut

If released, Mr. Crosby would not enter a world free from COVID-19. Therefore, the Court must compare the relative risks to Mr. Crosby between remaining in Fort Dix and being released to home confinement. Mr. Crosby proposes to live at his daughter's home in Manchester, Connecticut. *Def.'s First Mot.* at 3. A letter from Mr. Crosby's daughter confirms that she is willing to house him, financially support him, provide transportation, and reintegrate him into the workforce. *Daughter Letter.*

The Court recognizes that Mr. Crosby will be better able to socially distance and limit his exposure to COVID-19 if he moves in with his daughter in Manchester,

Connecticut. Manchester has experienced 1,023 total cases and 106 deaths from COVID-19. *COVID-19 Data Resources*, CT Data, https://data.ct.gov/stories/s/COVID-19-data/wa3g-tfvc/ (last visited Oct. 26, 2020). There are indications that the case rate in Manchester was trending in the right direction, with a new case rate of 5.8 per 100,000 residents over the two-week period from September 20, 2020 to October 3, 2020. *Id.* However, more recently, Manchester's new case rate rose to 8.4 per 100,000 residents from October 4, 2020 to October 17, 2020. *Id.* Although the record contains limited factual evidence about the conditions at Mr. Crosby's daughter's house, the Court finds it likely that he could more effectively limit his potential exposure to COVID-19 were he released than at Fort Dix.

### 4. Need for Just Punishment, Specific and General Deterrence

Mr. Crosby was arrested for this offense on September 19, 2017 and he has remained in custody since then. *PSR* ¶ 1. On July 30, 2019, the Court imposed a term of incarceration of 168 months. *J.* at 2. According to BOP calculations, Mr. Crosby is not eligible for home confinement in the ordinary course until February 24, 2029 and his projected release date is August 24, 2029. *Gov't Opp'n*, Attach. 3, *Sentencing Monitoring Computation Data* at 1. As of July 8, 2020, Mr. Crosby had served 20.0% of his full jail term and 23.4% of his statutory jail term. *Id.* at 2.

The Court does not diminish the impact on any person, including Mr. Crosby, of three years of incarceration, the amount of time he has now served. But, as noted earlier, Mr. Crosby has committed sixty-nine criminal offenses, including this federal crime, and he has spent much of his adult life in and out of jail. The prior imposition

of terms of incarceration varying from a few days to four years did not deter him from becoming the heroin supplier to a major drug distribution network.  Given the scale of his involvement, the Court does not find that an actual prison term of three years is sufficient to punish Mr. Crosby and to deter him from his habit of criminality.  The concept of general deterrence is more elusive, but on the assumption that others in the drug dealing world are aware of Mr. Crosby's criminal involvement, his prosecution, conviction, and sentence, his early release would send the wrong message about the consequences of engaging in large-scale drug trafficking.

### F.      The Balance Weighs Against Releasing Myron Crosby

The Court finds that release to home confinement is not warranted in this case. Myron Crosby supplied heroin to a criminal conspiracy which funneled a substantial quantity of heroin into central Maine.  He also has a substantial criminal record, which includes several violent offenses.  At the same time, he has several health conditions that substantially increase his risk of serious complications or even death from contracting COVID-19 and has a daughter who is willing to care for him at her home and allow him to limit exposure.  Despite his health conditions, the nature and seriousness of Mr. Crosby's offense, his criminal history, and dangerousness to the community counsel against his release.

## VI.   CONCLUSION

The Court DISMISSES without prejudice Myron Crosby's Revised Amended

Motion for Compassionate Release (ECF No. 200).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of October, 2020